JESSE S. KAPLAN CSB# 103726
5441 Fair Oaks Bl. Ste. C-1
Carmichael, CA 95608
(916) 488-3030
(916) 489-9297 fax

Attorney for Plaintiff
DAVID SCOTT

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SCOTT,<br><br>Plaintiff,<br><br>v.<br><br>THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY, BOWEN SCARFF FORD LINCOLN LONG TERM DISABILITY BENEFITS PLAN,<br><br>Defendants.<br>_______________________________/ | No. ______________________<br><br>COMPLAINT REGARDING DENIAL OF DISABILITY BENEFITS UNDER AN EMPLOYEE WELFARE BENEFITS PLAN |

Plaintiff DAVID SCOTT alleges:

## JURISDICTION AND VENUE

1. Jurisdiction of this court is conferred by the Employee Retirement Income Security Act of 1974 (*ERISA*), and in particular 29 U.S.C. §§1132(e)(1) and 1132(f). Those provisions give district courts jurisdiction to hear civil actions brought to recover benefits due under the terms of an employee welfare benefit plan, which in this case consists of a group disability plan provided by BOWEN SCARFF FORD LINCOLN to certain employees including plaintiff. In addition, this action may be brought before this court pursuant to 28 U.S.C. §1331, which gives

district courts jurisdiction over actions that arise under the laws of the United States.

2. The *ERISA* statutes provide, at 29 U.S.C. §1133, a mechanism for administrative or internal appeal of benefit denials. Plaintiff exhausted those remedies in the manner set forth below, entitling him to bring this complaint.

3. Venue is proper in the Eastern District of California because plaintiff, by the conclusion of that administrative process, resided in West Sacramento, County of Yolo, in the Eastern District. (20 U.S.C. §1132(e)(2), 28 U..C. §1391)

NATURE OF THE ACTION

4. This claim seeks an award to plaintiff of disability income benefits pursuant to an employee welfare benefit plan providing disability benefits to employees of Bowen Scarff Ford Lincoln, of which plaintiff was one. This action seeking recovery of benefits is brought pursuant to 29 U.S.C. §1132(a)(1)(B).

PARTIES

5. Plaintiff DAVID SCOTT, an individual, resides and resided in West Sacramento, County of Yolo, in the Eastern District, as stated above.

6. Defendant BOWEN SCARFF FORD LINCOLN LONG-TERM DISABILITY BENEFITS PLAN is named as constituting the relevant "employee welfare benefit plan" as defined by 29 U.S.C. §1001(1). Should this designation prove inaccurate, plaintiff may ask to amend this complaint to properly name the relevant plan. Incident to his employment with Bowen Scarff Ford Lincoln, plaintiff received coverage under this plan as a "participant," as defined by 29 U.S.C. §1002(7). This claim relates to benefits under that plan.

7. Defendant THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY performed the administrative reviews of this claim and may or may not prove to be the plan administrator of defendant plan and/or a plan fiduciary; all relevant actions set forth below were NORTHWESTERN MUTUAL's, and the funds for the benefits claimed by plaintiff would come from NORTHWESTERN MUTUAL.

STATEMENT OF FACTS

8. Plaintiff David Scott was born June 1, 1957. He attended Southern Nevada Vocational Technical Center and graduated from there in 1975, specializing in auto mechanics. Thereafter, he put together an impressive career in automotive service. He has certifications as both parts manager and service manager from both the Ford Motor Company and Chrysler Corporation. By 1990 he was service and parts director for a Jeep–Eagle dealership in Seattle, and since then has been either a service and parts director or, later, service manager for dealerships in Washington and the Bay Area.

9. Beginning January 2, 2013, Mr. Scott became the service manager for a dealership in the State of Washington called Bowen Scarff Ford–Lincoln. This meant he had overall management of the dealership's service department, a "light" and "skilled" job under the *Dictionary of Occupational Titles.* Defendant Northwestern Mutual's disability claim-file includes a confidential reference saying, among other things, of Mr. Scott that "Dave is world class and that is not an exaggeration." Its file indicates he was paid $10,000 per month at this job.

10. Before he began this job, in November 2011, Mr. Scott underwent a left nephrectomy for renal cell carcinoma.

11. On August 7, 2013, after being hired the previous January, a chest x-ray showed a large hernia protruding into his left chest cavity. A CT-scan performed August 21, 2013, clearly demonstrated this hernia and also contained several incidental findings including "a 1.6 x 1.5cm. enhancing mass in the left adrenal gland," as to which the radiologist wrote the comment, "Additional evaluation with MRI per adrenal protocol may be considered. I cannot exclude a metastatic or primary adrenal neoplasm." On August 23, 2013, Mr. Scott saw an internist, Dr. Judith Fleming. Her chart that day included, "CT scan shows adrenal lesion with recommendation to follow up with MRI" and "will call regarding MRI."

12. A September 17, 2013, MRI reported:

> The left adrenal gland contains a 1.7 x 2.3cm nodule, which demonstrates drop in signal on in-and-out of phase imaging suggesting intracellular/microscopic fat and therefore an adrenal adenoma.

Under "Impression," the report repeated this language and went on to say, "considering patient's history of renal carcinoma follow up imaging is recommend[ed] to document interval stability."

13. Mr. Scott saw his doctor, Rafat Unnisa, M.D., October 2, 2013. Dr. Unnisa's chart for that day included, "Advise checking repeat CBC. decreased kidney function- ?unknown baseline. advised recheck. regarding right renal mass- looks like benign edema on MRI. check for hormon[al] secretion- though do not anticipate any . . . ," and "advise repeating MRI for adrenal mass in 3 months."

14. Mr. Scott underwent laparoscopic repair of his large paraesophageal hernia December 6, 2013, and had a post-operation followup nine days and also six weeks later.

15. He saw Dr. Unnisa again May 12, 2014, when he had a respiratory infection.

16. On June 18, 2014, he had a chest ray that cast the left adrenal mass into suspicion and a repeat abdominal MRI, which resulted in the impression:

> The enlarging left adrenal nodule does not represent an adenoma. A necrotic neoplasm should be considered. The differential diagnosis includes metastatic renal cell carcinoma, pheochromocytoma or adrenal cortical carcinoma.

17. He saw Dr. Wayne Lau, the same surgeon who repaired his hernia, July 23, 2014, on referral from Dr. Unnisa, regarding this. Dr. Lau's chart noted that "Metabolic workup has been negative thus far for a homone secreting tumor," and the recommendation was for laparoscopic surgery.

18. Dr. Lau performed that laparoscopic left adrenalectomy October 9, 2014. Pathology of this revealed metastatic renal cell carcinoma, and Mr. Scott was referred for oncological care.

19. Dr. Tykodi saw Mr. Scott November 4, 2014. His report that day reads that the June

18, 2014, MRI "reidentified the left adrenal mass" as "increased in size versus the comparative imaging study from August 2013." Dr. Tykodi explained that progression of disease in this situation was likely in "months up to several years" but that the immune-stimulating therapy drug he recommended could result in complete remissions. A November 2014 exercise stress test showed poor exercise tolerance. Dr. Tykodi's December 15, 2014, chart did note "scintigraphic evidence of a small-sized region of mild myocardial ischemia involving the apical two-thirds of the inferior septal wall of the left ventricle." Subsequent imaging showed stable soft-tissue mesenteric/omental nodules that were likely metastatic deposits. In February 2015, Dr. Tykodi and Mr. Scott agreed to try "an alternate systemic agent" because of this. This resulted in very great pain, but Mr. Scott continued to perform his work, and the dosage was decreased. These nodules did decrease in size on subsequent imaging following tumor implants, but adjusting dosage and monitoring remained an ongoing process; the combination of all these things were making it so Mr. Scott could not perform work.

20. David Scott had contacted defendants and made a long-term disability claim during the first half of 2015, but he had also continued to work through all the foregoing events and so was denied because of his continued work activity. Northwestern's file includes a May 18, 2015, memo showing it had considered both the issue of a preëxisting condition and the possibility that a prior plan might provide continuity of coverage. This states that Mr. Scott's employer had indicated a prior plan existed.

21. Then, with a claim-received date of August 14, 2015, Mr. Scott made this claim for LTD benefits. He had submitted a letter of resignation dated July 24, 2015, citing his cancer and the side-effects of chemotherapy and pain medications.

22. Northwestern's file reflects that a nonexamining family practice doctor, Matthew Dubrow, D.O., reviewed the file and submitted a December 4, 2015, memo. This memo somewhat misstated the facts by saying that the August 23, 2013, office visit with Dr. Judith Fleming was "for follow up of test results performed to surveil an encapsulated malignant renal

cell carcinoma diagnosed two years and two months prior," when, as paragraph 11 indicates, the tests regarded a hiatal hernia; and it stated things with twenty-twenty hindsight by stating that "metastatic recurrence [was] *identified* [emphasis added] on August 21, 2013," when paragraph 11 above makes clear that was not the language of the radiologist, let alone anyone else. This Dr. Dubrow's language occurred, critically, in response to Northwestern's question, phrased, "Please identify any condition for which the claimant was seen for, received treatment or received prescribed medications for during the period of June 4, 2013 through November 30, 2013."

23. The policy in Northwestern's file contains a preëxisting condition exclusion provision that reads in pertinent part:

> Your are not covered for a Disability caused or contributed to by a Preexisting Condition or medical or surgical treatment of a Preexisting Condition unless, . . . .

and defines a "Preexisting Condition" thusly:

> This is a mental or physical condition for which you have consulted a Physician Or Practitioner, received medical treatment or services, or taken prescribed drugs or medications at any time during the Preexisting Condition Period shown in the **Specifications**.

Its "Specifications" section defines the "Preexisting Condition Period" as:

> The 180-day period just before the date your insurance becomes effective.

They state the "Policy Effective Date" to be "December 1, 2013."

24. A May 18, 2015, memo in Northwestern's file states "the employer indicated there was a prior plan so he likely would be covered under continuity of coverage," but nothing else about this then, and a December 2015, memo states the employer "doesn't think" there was a prior plan.

25. In a letter dated January 20, 2016, Northwestern Mutual denied David Scott's claim, saying "it appears you became a member December 1, 2013," stating the preëxisting condition period to be "June 4, 2013 through November 30, 2013," and repeating the nonexamining

doctor's misstatements quoted in paragraph 22 that Mr. Scott had been "seen on August 23, 2013," by a doctor "for follow up of test results performed to surveil an encapsulated malignant cell carcinoma diagnosed 2 years and 10 months prior," (quoting Northwestern's letter), when those tests were performed because of symptoms of the hiatal hernia; that the MRI of September 17, 2013, was "to evaluate a new left adrenal mass within the context of the your [sic] history of left renal carcinoma"; it omits any reference to the June 18, 2014, x-ray and MRI, which first contradicted the prior MRI's identification of the adrenal mass as probable adenoma and found *then* that it could be a "necrotic neoplasm," either renal cell cancer or adrenal carcinoma; and it flatly misstated the medical facts, following the wording of the nonexaminer, by referring to "metastatic adrenal recurrence identified on August 21, 2013," when of course this was neither an *adrenal* "recurrence" nor was it then identified as "metastatic."

26. There had been some informal colloquy, reflected in the file, between Northwestern and Mr. Scott about this preëxisting condition issue, but Mr. Scott always advised Northwestern that cancer was not diagnosed or treated in any way during 2013. At this point, Northwestern made a single payment to Mr. Scott because it had taken longer than *ERISA* and the policy permitted to make this determination. But because of Northwestern's denial he retained counsel to appeal.

27. Counsel's formal appeal letter of March 1, 2016, reviewed Mr. Scott's medical history in detail. It stated that even the summer 2014 imaging study was "a routine MRI to follow up . . . regarding the hernia repair . . . completed the previous year," that it was this MRI that showed "a larger mass on the left adrenal gland that now required surgery," and that only pathology following the October 9, 2014, surgery "identified renal cell carcinoma." It specifically stated that nonexamining Dr. Dubrow's memo "is inaccurate and should not be taken into consideration," that Dr. Dubrow's memo said "that Mr. Scott suffered from '. . . metastatic adrenal recurrence identified on August 21, 2013 . . . ,'" and that "The denial letter

from Northwestern Mutual repeats this inaccuracy." The letter devoted multiple sentences in two different paragraphs to clarifying that the adrenal cyst found in August 2013 "was not identified as cancerous," that it was found by "a scan . . . conducted in relation to the hernia issue, and was found coincidentally," that "the doctor opined that the cyst was an unremarkable fatty cyst, benign, and didn't need further investigation," and that Mr. Scott did not consult a physician or practitioner, receive medical treatment or services, or take drugs or medication prescribed for it during 2013.

28. The letter also provided a detailed legal explanation with citations covering multiple paragraphs over more than one page that Northwestern's preëxisting condition provision would "generally be construed in favor of the Plaintiff if a disease or condition manifests before the effective date of the policy, but is not diagnosed until after the policy takes effect" and specified ambiguous language in the provision supporting such construction.

29. The letter pointed out that not only did the consultation-treatment-services-prescriptions policy language not apply but that "there is no evidence to support the proposition that the adrenal mass was even malignant at that point. In fact, Mr. Scott's doctors stated that the cyst was benign."

30. Northwestern now engaged another nonexaminer, Dr. Bradley Fancher, an internal medicine specialist. Dr. Fancher's report elaborated on how and why the September 17, 2013, MRI recommended followup imaging because of Mr. Scott's history of renal carcinoma: that carcinoma could not be excluded, and that followup imaging was because a cancer would usually grow more noticeably over time than an adenoma. It pointed out that Dr. Unnisa, on October 2, 2013, had charted that Mr. Scott should have a repeat MRI in three months. It said the records referred to a "mass," not a "cyst." It stated that the June 2014 MRI was "concerning for neoplastic disease as opposed to a benign adenoma" and that following the October 2014 surgery it proved to be metastatic renal cancer. Dr. Fancher's report declared: "It is very clear that the claimant was evaluated for this adrenal mass" during the preëxisting

condition period, but also acknowledged that testing of adrenal hormone levels ordered by Dr. Unnisa during this period was normal, explaining that levels could have been normal because the lesion later was "proven to be metastatic ***renal*** cancer." (Emphasis in original.)

31. Thus, Dr. Fancher's report identified nothing not previously identified regarding the preëxisting condition issue, added no insight, and did not directly address the policy language defining that issue the way the previous nonexamining report had. Neither does Northwestern's file reveal any analysis of the policy language or legal analysis of the points raised by Mr. Scott's attorney on appeal. All it reveals is that, only two days before the issuance of its final denial letter, the author of that letter wrote a memo to the file reflecting that she explained she then "had not yet completed my review" to an individual at Bowen Scarff Ford-Lincoln, who said that Bowen Scarff "is not very happy with the service . . . on this claim" and that "there are 16 other people insured under the plan and they would end up being without insurance."

32. Northwestern's letter two days later, April 14, 2016, without any discernible further basis in the file, constituted its final denial. It flatly stated:

> [O]ur review found medical documentation providing evidence that Mr. Scott consulted a Physician Or Practitioner and/or received medical treatment or services during the Preexisting Condition period (June 4, 2013 through November 30, 2013), on the dates including, but not limited to, those outlined below:

It then summarized Mr. Scott's medical history. In one footnote, appended to its summary of the August 21, 2013, CT report, it said, "As clearly demonstrated by *subsequent medical records,* this mass 'caused or contributed to' Mr. Scott's *eventual diagnosis* of metastatic renal cell carcinoma which is the cause of his Disability." (Emphases added) In another footnote, appended to its summary of Mr. Scott's Dr. Unnisa appointment of October 2, 2013, it said, "Although Dr. Unnisa recommended Mr. Scott having a MRI for monitoring of his adrenal mass in three months, we did not find documentation of him undergoing a repeat MRI in January 2014 as recommended, or any time prior to the repeat MRI eventually

done June 18, 2014." It asserted that, "With regard to the *right renal mass* [sic] for which Mr. Scott consulted a Physician and received medical services and treatment for during [sic] the Preexisting Condition Period," (emphasis added), "this treatment was not during the Preexisting Condition Period, [but] it is material to assessment of whether Mr. Scott's disability beginning August 8, 2015 is caused or contributed to by a Preexisting Condition as explained below." The letter then summarized the 2014 medical events leading to the October 2014 adrenalectomy and diagnosis of metastatic renal cancer. It concluded: "the diagnosis of Mr. Scott's medical condition as documented in Mr. Scott's chart notes during the Preexisting Condition Period were 'mass in the left adrenal gland,' 'unspecified disorder of adrenal glands' and 'new left adrenal mass' that was initially found and treated during the Preexisting Condition Period . . . . Therefore, based on Mr. Scott's medical history, treatment, and subsequent records as outlined above, Ms. [sic] Scott's Disability due to metastatic renal cell carcinoma as of August 8, 2015 is clearly caused or contributed to by the left adrenal mass which is his Preexisting Condition pursuant to the terms of the Group Policy." This denial letter did not otherwise address the legal argument made on appeal by Mr. Scott's lawyers, assumed its own conclusion in using the policy term "Preexisting Condition" while using the policy language "caused or contributed to by a Preexisting Condition," and failed to explain why Mr. Scott's medical history made his 2013 adrenal mass a "preëxisting condition" according to the policy definition of that term.

33. Nowhere in these denials, and nowhere in Northwestern's file, is there any contention that David Scott was and is not disabled within the meaning of the plan and policy; and implicit in this preëxisting condition basis of these denials is the premise that his "Disability" was and is disabling.

34. Plaintiff's administrative remedies were, thus, exhausted; and as a direct, legal and proximate consequence of defendants' acts, omissions, and breaches of the plan, policy, and *ERISA,* David Scott has exhausted his administrative remedies without defendants having

properly considered his claim and is entitled to pursue this complaint to secure the disability benefits defendants denied him.

## CLAIMS

35. The determination by defendants that plaintiff was not entitled to long term disability benefits under the plan was contrary to the plan, *ERISA,* and the evidence, lacks rational and legal support, and was arbitrary and capricious.

36. Defendants failed properly to interpret and administer the plan pursuant to 29 U.S.C. §1104.

37. Defendants failed to provide adequate notice specifying their reasons for denial in a manner calculated to be understood by plaintiff such that he could perfect an appeal, in fact simply misconstrued and misrepresented the medical evidence in their initial denial, and failed to provide any documents when requested that explained their decisionmaking, other than as set forth above.

38. Defendants failed properly to consider all the evidence.

39. Defendants acted under a conflict of interest in denying the claim, and such conflicts of interest were contrary to plan terms and *ERISA*, which impose fiduciary duties on plan administrators and require any delegation of such authority as would be relevant here be done according to specified procedures.

40. Defendants did not give fair, impartial weight to plaintiff's evidence and arguments, and relied instead on in-house consultants, on illogical and improper methodology, and on self-serving, inaccurate interpretations of plan terms without proper reference to the facts and to legal principles, and relied on or imposed nonexistent requirements.

41. All of the foregoing constituted breach of defendants' fiduciary duties under §1104 and other authority.

42. Plaintiff's claim was therefore unlawfully denied, and he is entitled to an order granting him benefits and otherwise enforcing the plan under 29 U.S.C. §1132(a)(1)(B) and

other authority.

**WHEREFORE,** plaintiff prays for the following relief:

A. That the court enter judgment in plaintiff's favor and against defendants, and that the court order defendants to pay disability benefits, and award all other consequent rights and privileges consistent with the Plan to plaintiff, including all back benefits, and all rights appurtenant to having been awarded disability status at the proper time;

B. That the court order declaratory and injunctive relief whereby plaintiff's disability claim is reopened, granted, and his attorney fees are paid;

C. That the court order attorney fees paid to plaintiff pursuant to 29 U.S.C. §1132(g);

D. That the court impose prejudgment interest to the maximum extent allowed by law on all monetary awards and orders made in plaintiff's favor, and further order post-judgment interest from the date of such awards and orders;

E. That the court grant plaintiff any other and further relief to which she may be entitled, including costs of suit.

DATED: March 14, 2017

*/s/ Jesse S. Kaplan*

JESSE S. KAPLAN
Attorney for Plaintiff
DAVID SCOTT